**FOR PUBLICATION**

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY

-------------------------------------------------------X

| | |
|---|---|
| In Re: | Chapter 11 |
| Dots, LLC., | Case No. 14-11016 (MBK) |
|      Debtor. | |

-------------------------------------------------------X

| | |
|---|---|
| Dots, LLC, | |
|      Plaintiff | |
| v. | Adv. Pro. No. 14-01818 (MBK) |
| Milberg Factors, Inc., | |
|      Defendant. | |

-------------------------------------------------------X

| | |
|---|---|
| Dots, LLC, | |
|      Plaintiff | |
| v. | Adv. Pro. No. 14-01826 (MBK) |
| Finance One, | |
|      Defendant. | |

-------------------------------------------------------X

**APPEARANCES:**

Joseph J. DiPasquale, Esq.
Joshua H. Raymond, Esq.
Henry M. Karwowski, Esq.
Trenk, DiPasquale, et. al.
347 Mt. Pleasant Avenue, Suite 300
West Orange, NJ 07052
*Attorney for Dots, LLC.*

Lucas F. Hammonds, Esq.
George R. Hirsch, Esq.
Sills Cummis & Gross PC
One Riverfront Plaza
Newark, NJ 07102
*Attorneys for Milberg Factors, Inc. and Finance One*

**MICHAEL B. KAPLAN, U.S.B.J.**

## MEMORANDUM DECISION

### I.    Introduction

The matters before the Court in this these adversary proceedings are two complaints brought by Plaintiff Dots, LLC ("Dots" or "Debtor" or "Plaintiff"), against Defendants Finance One, Inc. and Milberg Factors, Inc. (collectively, "Defendants" or "Factors;" or, individually, "Finance One" and "Milberg"), seeking the recovery of prepetition transfers on the basis that the transfers were preferential transfers, recoverable under 11 U.S.C. § 547(b).  Defendants assert that the transfers are not voidable because they have valid affirmative defenses under § 547(c).

### II.   Factual Background and Procedural History

Prior to liquidation of the business, Dots was a women's discount clothing retailer.  The relationships between Dots and the Factors arise out of an arrangement between Dots, the vendors, and the Factors.  Dots purchased its products from multiple vendors.  Pursuant to Collection Date Factoring Agreements ("Factoring Agreements"), the vendors—as clients of the Factors—agreed to sell, assign and transfer to Factors the accounts receivable owing by Dots on pre-approval transactions.[1]  The Factors agreed to purchase the vendors' accounts and maintained full authority as a "factor" to collect and otherwise deal with such accounts as the sole and exclusive owner.  Dots placed orders for goods with the vendors, and the Factors approved and purchased the accounts from the vendors.  The vendors then shipped goods to Dots, and Dots made payments for those goods directly to the Factors.  Significantly, the Factors did not enter into any agreement directly with Dots.

---

[1] Pursuant to the Factoring Agreements, the Factors agreed to purchase the accounts for all transactions between the vendors and customers; however, with limited exceptions, only the pre-approved transactions were undertaken without recourse to the vendors subsequent to the acquisition of the accounts.  The parties have not identified any factored transactions which were not pre-approved.

Sometime in late 2012 and early 2013,[2] the Factors adjusted the credit lines and reduced the amount of credit made available to the vendors for sales to Dots.  This credit line adjustment had the effect of reducing the amount of new inventory that Dots could purchase on credit.  In order to maintain a historically consistent level of inventory purchases and expend credit availability, Dots began to anticipate payments and pay for the goods earlier than required by the terms of their invoices.[3]   However, the Factors never formally changed the terms of the vendors' invoices.

On January 20, 2014, Dots filed a voluntary bankruptcy petition under Chapter 11 of the Bankruptcy Code in the District of New Jersey.  On October 1, 2014, Dots commenced two adversary proceedings against Defendants seeking to avoid transfers made by Dots to Factors as preferential payments under 11 U.S.C. § 547(b).

After denying initial motions for summary judgment, the Court ordered the parties to participate in mediation; however, they were unable to reach a settlement.  Following the unsuccessful meditation, the Court directed, and the parties agreed, to pursue a briefing schedule in an effort to narrow the legal issues and guide the course of discovery.  The briefing—which is submitted in the form of Dots' motion for partial summary judgment ("Motion")—is designed to resolve limited legal issues relative to the scope and applicability of the ordinary business terms defense under 11 U.S.C. § 547(c)(2)(B), and the applicability of the new value defense under 11 U.S.C. § 547(c)(4).  Additionally, to the extent the new value defense is applicable, the parties

---

[2] For the purposes of this Summary Judgment Motion, this Court need not make findings as to specific dates on which credit lines were reduced.

[3] The parties agree that throughout the preference period, payment terms under the invoices for all transactions were net ten end of month ("EOM net 10").  Under these terms, if goods are received prior to the 20th of a month, the goods must be paid for by the 10th of the next month.  If goods are received subsequent to the 20th of a month, then payment is due on the 10th of the month after next.  For example, for goods received on January 12th, payment is due by February 10th.  However, for good received on January 22nd, payment is due by March 10th.

contest whether that new value must remain unpaid, whether the new value is secured by a security interest, and whether the new value should be considered in the aggregate, or by individual transaction per vendor.  Finally, the parties dispute whether the affirmative defenses available under § 547(c) should be addressed in a particular order.

The parties each submitted initial papers and responsive documents.  A hearing was held on November 17, 2017.  The Court has considered the submissions of the parties and the arguments set forth on the record during the November 17 hearing (the "Hearing").  While the Court at the Hearing made preliminary determinations and explained its rationale, the Court expressed its intent to consider additional legal argument and reach final conclusions to be reflected in a written ruling.

## III.    Jurisdiction

Jurisdiction over these actions is found under 28 U.S.C. §§ 1334(a) and 157(a), as well as the Standing Order of the United States District Court dated July 10, 1984, as amended October 17, 2013, referring all bankruptcy cases to the bankruptcy court.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(F), and "arises under" title 11.  Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.  As outlined by the Third Circuit, bankruptcy jurisdiction extends to four types of title 11 matters: (1) cases "under" title 11; (2) proceedings "arising under" title 11; (3) proceedings "arising in" a case under title 11; and (4) proceedings "related to" a case under title 11. *In re W.R. Grace & Co.*, 591 F.3d 164, 171 (3d Cir. 2009); *In re Combustion Eng'g, Inc*., 391 F.3d 190, 225 (3d Cir. 2005).  "'[A]rising under' jurisdiction includes any proceeding which invokes a substantive right under the Bankruptcy Code." *In Re Revel AC, Inc.*, No. 14-22654, 2016 WL 6155903, at *5 (Bankr. D.N.J. Oct. 21, 2016) (citing *In re Bell*, 476 B.R. 168, 175 (Bankr. E.D.Pa. 2012)); *In re Winstar Commc'ns,*

*Inc.*, 554 F.3d 382, 405 (3d Cir. 2009).  A proceeding that "arises under" title 11 is also

described as one involving a cause of action created by, or a substantive right determined by, a

provision of title 11. *Stoe v. Flaherty*, 436 F.3d 209, 217 (3d Cir. 2006), *as amended* (Mar. 17,

2006).

The current actions concern preferential transfers under § 547 and, thus, qualify as

matters "arising under" title 11. *See Stern v. Marshall*, 564 U.S. 462, 497, 131 S. Ct. 2594, 2617,

180 L. Ed. 2d 475 (2011) ("A preferential transfer claim can be heard in bankruptcy when the

allegedly favored creditor has filed a claim, because then the ensuing preference action by the

trustee become[s] integral to the restructuring of the debtor-creditor relationship.") (citation and

internal quotations omitted).

## IV.    Discussion

Dots argues that partial summary judgment in its favor is appropriate because the

transfers at issue are preferential payments to which no affirmative defenses apply.  The Factors

respond that the transfers at issue are not recoverable because they fall within one of the

exceptions to the general preference rule, as listed in § 547(c)(2) and § 547(c)(4).  Accordingly,

the Factors assert that Dots' Motion should be denied in its entirety.

### A.  Standard of Review

Summary judgment is proper if there is no genuine dispute over any material fact and if,

viewing the facts in the light most favorable to the non-moving party, the moving party is

entitled to judgment as a matter of law. FED. R. CIV. P. 56(a); FED. R. BANKR. P. 7056; *see also*

*Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L.Ed.2d 265 (1986).  A fact is

material when it could "affect the outcome of the suit." *Anderson v. Liberty Lobby, Inc.*, 477

U.S. 242, 252, 106 S. Ct. 2505, 2512, 91 L. Ed. 2d 202 (1986).  The movant bears the burden of

establishing that no genuine dispute as to any material fact exists. *See Matsushita Elec. Indus.*

*Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585 n.10, 106 S. Ct. 1348, 1355, 89 L. Ed. 2d 538

(1986). Once the moving party establishes a prima facie case in its favor, the opposing party

must go beyond the pleadings and identify specific facts showing more than a scintilla of

evidence that a genuine dispute of material fact exists. *See, e.g., Anderson,* 477 U.S. at 252;

*Matsushita,* 475 U.S. at 585–86; *Wiest v. Tyco Elecs. Corp.*, 812 F.3d 319, 328 (3d Cir.), *cert.*

*denied*, 137 S. Ct. 82, 196 L. Ed. 2d 198 (2016).

At the summary judgment stage, the judge's function is not to weigh the evidence and

determine the truth of the matter, but to determine whether there is a genuine issue for trial.

*Anderson,* 477 U.S. at 249*; see also Aleynikov v. Goldman Sachs Grp., Inc*., 765 F.3d 350, 363

(3d Cir. 2014). The application of summary judgment in bankruptcy adversary proceedings in

particular is an often efficient means to preserve limited estate assets. It "is properly regarded

not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a

whole, which are designed 'to secure the just, speedy and inexpensive determination of every

action.'" *Celotex Corp.,* 477 U.S. at 327, 106 S. Ct. 2548 (*quoting* FED. R. CIV. P. 1); *see also In*

*re Bayonne Med. Ctr.*, 429 B.R. 152, 173–74 (Bankr. D.N.J. 2010). For purposes of this Motion,

there is no genuine dispute as to a material fact which serves as a bar to resolving the legal issues

addressed herein.

Under § 547(g), the trustee bears the burden of proof by a preponderance of evidence for

the five elements of an avoidable preference set forth in § 547(b). *In re Bayonne Med. Ctr.*, 429

B.R. at 174 (citing *J.P. Fyfe, Inc. of Fla. v. Bradco Supply Corp.,* 891 F.2d 66, 71 (3d Cir.

1989)). Likewise, the party contending that the transfer falls under the exceptions in § 547(c)

bears the burden of proving that assertion. 11 U.S.C. § 547(g); *see also In re Bayonne Med. Ctr.*,

429 B.R. at 174. "In the context of a motion for summary judgment, the burden of proof remains with the party asserting the non-avoidability of the transfer; the Debtor simply needs to point to the absence of such proof to make its case." *Burtch v. Detroit Forming, Inc. (In re Archway Cookies),* 435 B.R. 234, 240 (Bankr. D. Del. 2010).

### B. Analysis

At the outset, the Court reiterates its admonition offered at the Hearing. Specifically, the Court noted that, notwithstanding its preliminary oral rulings and discussion, it welcomed additional limited submissions addressing the Court's ruling, and reserved the right to re-examine any and all determinations as part of a written ruling. It is beyond peradventure that a court has the inherent right to reconsider any ruling before final judgment. *See* Fed. R. Civ. P. 54(b), made applicable to adversary proceedings by Fed. R. Bankr. P. 7054 (stating that a court may reconsider its interlocutory order at any time before making a final determination with respect to all of the claims of all of the parties); *State Nat'l Ins. Co. v. Cty. of Camden*, 824 F.3d 399, 406 (3d Cir. 2016) (citing *United States v. Jerry*, 487 F.2d 600, 605 (3d Cir. 1973) ("[S]o long as the district court has jurisdiction over the case, it possesses inherent power over interlocutory orders, and can reconsider them when it is consonant with justice to do so."); *see also, e.g., In re Anthanassious*, 418 F. App'x 91, 95–96 (3d Cir. 2011) (explicitly extending the inherent power to reconsider a prior ruling to a bankruptcy court). In the present matter, the Court indeed has re-evaluated critical facts and their legal ramifications. To be clear, and as discussed in detail below, the Court's change of heart results from a re-examination of certain facts not in dispute; while relevant, the Defendants' post-Hearing submission was not the catalyst for the Court's change in direction.

Under 11 U.S.C. § 547, a trustee or the debtor-in-possession can dismantle select transactions between a debtor and its creditors that occurred within the ninety (90) days [or a year if the creditor is an "insider"] immediately preceding the bankruptcy filing. *Barnhill v. Johnson*, 503 U.S. 393, 394, 112 S. Ct. 1386, 1387, 118 L. Ed. 2d 39 (1992); *see also* 11 U.S.C. § 110; *In re Winstar Commc'ns, Inc.*, 554 F.3d at 394; *In Re Dots, LLC*, 533 B.R. 432, 437 (Bankr. D.N.J. 2015).  If the bankruptcy court declares that an avoidable preference has occurred, the creditor must forfeit its improved position and must return any preferential transfers it received. *Johnson*, 503 U.S. at 394.  Section 547(b) explains the elements of a preferential transfer:

> Except as provided in subsection (c) of this section, the trustee may avoid any transfer of an interest of the debtor in property—
>
> (1) to or for the benefit of a creditor;
>
> (2) for or on account of an antecedent debt owed by the debtor before such transfer was made;
>
> (3) made while the debtor was insolvent;
>
> (4) made—
>
>> (A) on or within 90 days before the filing of the petition; or
>>
>> (B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and
>
> (5) that enables such creditor to receive more than such creditor would receive if—
>
>> (A) the case were a case under Chapter 7 of this title
>>
>> (B) the transfer had not been made; and
>>
>> (C) such creditor received payment of such debt to the extent provided by the provisions of this title.

11 U.S.C. § 547(b).

Section 547's avoidance power aims "to foster equality of treatment among creditors and to discourage creditors from incapacitating a firm by racing to attach its assets shortly before bankruptcy." *In re Dots, LLC*, 533 B.R. at 437 (Bankr. D.N.J. 2015) (quoting *Pineview Care Ctr. v. Mappa (In re Pineview Care Ctr.)*, 152 B.R. 703, 705 (D.N.J. 1993)); *see also In re Molded Acoustical Prod., Inc.*, 18 F.3d 217, 219 (3d Cir. 1994).  In a preference action, § 547(b) places the burden of proof on the trustee or the debtor-in-possession to establish the avoidability of a transfer by a preponderance of the evidence. *See* 11 U.S.C. § 547(g).  Moreover, the trustee or debtor-in-possession must overcome any defenses a transferee may have pursuant to § 547(c).

Here, the parties agree that the transfers at issue were payments made to creditors on account of an antecedent debt, on or within ninety (90) days before the date the petition was filed, which allowed the creditors to receive more than such creditor would have received if the payments had not been made and the creditors stood with other unsecured creditors.  For purposes of the Motion, the Court is satisfied that Dots has established, by a preponderance of the evidence, each of the statutory elements of a preference for the transfers at issue.  The parties disagree, however, as to whether the affirmative defenses set forth in § 547(c) are available to the Factors, and as to how those affirmative defenses should be applied.

As set forth above, the consensual briefing schedule was intended to address the following legal issues:

(1) the scope and applicability of the ordinary business terms defense of 11 U.S.C § 547(c)(2)(B);

(2) whether a court in calculating a preference defendant's liability, if any, should apply the defendant's affirmative defenses under 11 U.S.C. § 547(c) in any particular order;

(3) whether the extension of credit by a factor to an underlying vendor can constitute new value, as defined in 11 U.S.C. § 547(a)(2), and, if so, in order to satisfy 11 U.S.C. § 547(c)(4) whether:

(a) the new value must remain unpaid;

(b) the new value (in the form of an extension of credit by the factor) is not secured by an otherwise unavoidable security interest in debtor's receivables; and

(c) under the circumstances of this case, should such new value be calculated on a de-coupled or coupled basis.

The Court will analyze each issue in turn.

### 1. Scope of Matters to be Considered under the Objective (Ordinary Business Terms) Defense of 11 U.S.C § 547(c)(2)(B).

Section 547(c)(2) permits a "safe harbor" for preferential transfer payments if

such transfer was in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee, and such transfer was

(A) made in the ordinary course of business of the debtor and transferee, or

(B) made according to ordinary business terms.

11 U.S.C. § 547(c)(2);[4] *see also In re Molded Acoustical Prod., Inc.*, 18 F.3d at 221.

Defendants in this case have raised the defense under § 547(c)(2)(B),[5] which calls for an

objective analysis of the business terms of the subject transfer. *See In re Bayonne Med. Ctr.*, 429

B.R. at 187. This objective test examines "ordinary business terms" in relation to general norms

within the creditor's industry. *In re Molded Acoustical Products, Inc.*, 18 F.3d at 224–25. Thus,

---

[4] Prior to the enactment of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA"), Pub. L. 109–8, 119 Stat. 23 § 409 (Apr. 20, 2005), there was a single ordinary course of business defense under § 547(c)(2). Under this section, a defendant in a preference matter had to prove both: (i) that the challenged transfer was "made in the ordinary course of business or financial affairs of the debtor and the transferee" and (ii) that the transfer was "made according to ordinary business terms." The revisions to the code in 2005 have changed the pertinent section to two sections, §§ 547(c)(2)(A) and (B), and have made these stand-alone affirmative defenses. *See In re Conex Holdings, LLC*, 518 B.R. 269, 280 n.52 (Bankr. D. Del. 2014), *reconsideration denied*, 524 B.R. 55 (Bankr. D. Del. 2015); *see also* the 2005 House Report ("Section 409 amends section 547(c)(2) of the bankruptcy Code to provide that a trustee may not avoid a transfer to the extent such transfer was in payment of a debt incurred by the debtor in the ordinary course of the business or financial affairs of the debtor and the transferee and such transfer was made either: (1) in the ordinary course of the debtor's and the transferee's business or financial affairs; or (2) in accordance with ordinary business terms.").

[5] Section 547(c)(2)(A) is not before the Court in this matter; however, Defendants have not waived the right to raise that defense.

10

even if the challenged transfers were irregular, they may be considered ordinary for purposes of

the objective test if they were consistent with the patterns within the relevant industry. *Bohm v.*

*Golden Knitting Mills, Inc. (In re Forman Enterps., Inc.),* 293 B.R. 848, 860 (Bankr. W.D. Pa.

2003). "The creditor's industry is the measure for ordinariness under the objective test." *In re*

*AFA Inv. Inc.*, No. 12-11127, 2016 WL 908212, at *4 (Bankr. D. Del. Mar. 9, 2016) (citing *Sass*

*v. Vector Consulting, Inc. (In re Am. Home Mortgage Holdings, Inc.),* 476 B.R. 124, 140–41

(Bankr. D.Del. 2012)).

     The initial inquiry for this Court is the scope of the matters to be considered under this

objective test. In other words, this Court must determine the relevant industry—and the general

norms of that industry—so the Factors' actions can be examined in the larger context of the

common practice. Defendants contend that the relevant industry in which the transfers should be

examined is the industry of "factoring of vendor's sales to retailers in the clothing industry."

Transcript of November 17, 2016 Hearing at 7:4-6, *Dots, LLC v. Milberg Factors, Inc.*, Case No.

14-1818 (Bankr. D.N.J. Nov. 21, 2016) ECF No. 27 ("Hrg. Tr.").

     In their written submissions, Dots asserts that "the past relationship between the Debtors

and Defendants, and any credit issues between them, including any credit hold imposed by

Defendants is relevant to determining whether the transfers at issue were made according to

ordinary business terms in the industry." Mot. for Summ. J. at 15, *Dots, LLC v. Milberg Factors*,

*Inc.*, Case No. 14-1818 (Bankr. D.N.J. Sept. 16, 2016) ECF No. 18 ("Dots' Mot. for Summ. J.").

Thus, it seems that Dots believes the relevant—if not dispositive—inquiry for the ordinary

business terms analysis should be the deviation in conduct from the pre-preference period

relationship between Dots and the Factors.[6] During oral argument, counsel for Dots again

---

[6] Dots also devotes significant portions of its submissions and the argument made during the November 17, 2016
Hearing to identifying inconsistencies in the Factors' position. Specifically, Dots points out that the Factors

asserted that the Factors' past actions are relevant to the ordinary business terms analysis. Dots concludes that it is entitled to summary judgment based on the past course of conduct. Indeed, according to Dots, the mere fact that the parties' credit relationship changed during the preference period is sufficient to preclude a finding that the challenged transfers were made according to ordinary business terms. The Court disagrees and opines that the examination should be focused primarily upon whether the transactions reflected a divergence from industry norms.

Dots' suggested approach—examining the historical practice and pre-preference period activity in comparison to the subject transfers—is far too narrow. The parties' preference period conduct cannot be viewed in a vacuum. In order to determine whether the transactions in this case were made pursuant to ordinary business terms of the creditor's industry, the Court must have a more comprehensive understanding of the industry in which these parties operated. Specifically, as the Factors suggest, the inquiry must extend into the industry of factoring sales to clothing retailers. *See* 5 COLLIER ON BANKRUPTCY § 547.04[2][a][iii][A] (Alan N. Resnick & Henry J. Somme eds., 16th ed. 2016) ("The [ordinary business terms] provision allows the creditor considerable latitude in defining what the relevant industry is."). As stated during the Hearing, this Court "cannot make a determination that a transaction does or does not fall within

---

previously argued that evidence of transactions between third parties in the industry was not relevant to the instant case, whereas now the Factors assert that the general conduct of factors in this industry is relevant to its ordinary business terms defense. Dots contends that "in light of their failure to present a consistent position in this proceeding, Defendants will simply be unable to prove the ordinary business terms defense at trial." Br. In Opp'n at 7, *Dots, LLC v. Milberg Factors, Inc.*, Case No. 14-1818 (Bankr. D.N.J. Nov. 10, 2016) ECF No. 20 ("Dots' Opp'n"). While the Factors' position regarding the evidence relevant to the ordinary business terms defense has certainly evolved, the Court does not find that this change was made with malice or with an intent to avoid discovery obligations. Instead, it appears to stem from a changed understanding of the law and the relevant inquiry for an ordinary business terms defense. Given that the purpose of the briefing procedure mandated by the Court was to resolve legal issues—including this very issue—and to guide the course of discovery, the Court does not interpret the Factors' failure to present a consistent position as an indication that it will be unable to demonstrate an ordinary business terms defense at a later date.

the norms undertaken in this industry as described without understanding all aspects of the transaction, which would include [but is not limited to] changes in credit terms undertaken in the industry, as well as in this specific case, so [the Court] can have a comparison." Hrg. Tr. 50:1-6. For instance, a critical area of concern for the Court is whether the Factors' credit line adjustments were undertaken with the goal of coercing payment, or rather, reducing exposure consistent with industry practices.  For these reasons, a more extensive factual record is needed and Dots is not entitled to summary judgment.

### 2.   Order of Affirmative Defenses

The Factors contend that the affirmative defenses under § 547(c) should be available in the order that a defendant deems most advantageous.[7]  This Court agrees.  This determination is consistent with bankruptcy principles in general and, specifically, the policies underlying the § 547(c) affirmative defenses, which are designed to encourage trade creditors to continue dealing with financially distressed business, and to ensure that those creditors are treated equitably. *See In re Net Pay Sols., Inc.*, 822 F.3d 144, 150 (3d Cir. 2016); *In re Friedman's Inc.*, 738 F.3d 547, 558 (3d Cir. 2013); *see also In re Molded Acoustical Prod., Inc.*, 18 F.3d 217.

As discussed during the Hearing, to hold that the new value affirmative defense, § 547(c)(4), must be applied prior to the ordinary business terms defense, § 547(c)(2)(B), is inconsistent with the language of the statute and irreconcilable with its practical application. Pursuant to § 547(c)(4), the new value defense is only available to a creditor where the transfer in question is "otherwise unavoidable."  Therefore, in order to determine the validity of the new value defense under § 547(c)(4), a court must necessarily undertake an examination of whether the transfer is unavoidable as protected by another § 547(c) affirmative defense, such as an

---

[7] In the briefings, Dots did not express its position regarding the order in which the Court should apply affirmative defenses for purposes of calculating preference liability.

ordinary business terms defense. *See, e.g., In re Phoenix Rest. Grp., Inc.*, 317 B.R. 491, 499–500

(Bankr. M.D. Tenn. 2004) (collecting cases) (holding that application of § 547(c)(4) requires

prior determination of whether the transfer is protected under other portions of § 547).

### 3.   New Value Pursuant to § 547(c)(4)

The Factors next assert an affirmative defense pursuant to § 547(c)(4), and contend that

they provided new value for Dots in the form of credit.  This defense—known as the "subsequent

new value defense"—provides that a transfer is not avoidable to the extent the transfer was:

> (4) to or for the benefit of a creditor, to the extent that, after such transfer, such
> creditor gave new value to or for the benefit of the debtor--
>
> > (A) not secured by an otherwise unavoidable security interest; and
> >
> > (B) on account of which new value the debtor did not make an otherwise
> > unavoidable transfer to or for the benefit of such creditor

11 U.S.C. § 547(c).

Dots contends that Defendants' new value argument lacks merit for four reasons.

Specifically, Dots asserts that (1) the extension of credit was made to the vendors, not to the

Dots, and, therefore, did not constitute new value; (2) any new value provided by Defendants did

not remain unpaid as it must in order for the new value defense to apply; (3) any new value

provided by Defendants was secured by a security interest in accounts; and (4) any new value

provided by Defendants must be calculated on a de-coupled basis and, under such a calculation,

Defendants' net preference liability is significant. Dots' Mot. for Summ. J. at 1.  Again, the

Court will address each argument in turn.

### a.   Did the Factors provide new value pursuant to § 547(c)(4)?

During the Hearing, the Court rejected the Factor's argument that they extended new

value to Dots in the form of new credit.  The Court maintains that position and finds that the

Factors did not provide new value to Dots in the form of new credit.  Nevertheless, after further

consideration of the specific facts of this case, and for the reasons that follow, the Court rules

that the Factors did provide new value to Dots in the form of goods.

A new value defense is available to an entity under § 547(c)(4) to the extent that "such

creditor gave new value." Accordingly, in order for the Factors to successfully avail themselves

of the new value defense, they must be creditors of Dots who supplied new value. It is

undisputed that the Factors qualify as creditors of Dots.[8] The Factors have a claim against Dots;

and it was the Factors—not the vendors—who filed a proof of claim in this matter. The parties

are in agreement as to this issue. The parties differ, however, as to whether the Factors actually

provided the new value to Dots.

Section 547 defines new value as:

> money or money's worth in goods, services *or new credit*, or release by a
> transferee of property previously transferred to such transferee in a transaction
> that is neither void nor voidable by the debtor or the trustee under any applicable
> law, including proceeds of such property, but does not include an obligation
> substituted for an existing obligation;

11 U.S.C. § 547(a)(2) (emphasis added).

The Factors contend that they provided new value to Dots in the form of extensions of

credit. In opposition, Dots asserts that the new value defense is not available to the Factors

because it was the vendors—and not the Factors—who provided the credit in question. Dots

cites to the specific language of the statute which provides that the transfer must be "to or for the

benefit of a creditor, to the extent that, . . . *such creditor* gave new value." 11 U.S.C. § 547(c)(4)

(emphasis added). Dots states that a creditor who has merely purchased accounts receivable

from a debtor's vendor pursuant to a factoring agreement does not extend credit to the debtor as

part of the transaction. Dots relies on an out-of-circuit case from a bankruptcy court in the

---

[8] The Code defines "creditor," in relevant part, as an "entity that has a claim against the debtor that arose at the time
or before the order for relief concerning the debtor." 11 U.S.C. § 101(10)(A).

Western District of Texas in support of this proposition. *See In re Country Junction, Inc.*, 49

B.R. 708 (Bankr. W.D. Tex. 1985), *vacated pursuant to settlement sub nom. Matter of Country*

*Junction, Inc.*, No. 86-1741, 1987 WL 49438 (5th Cir. Aug. 3, 1987).

In response, the Factors posit that they, as factors, extended credit to Dots.  The Factors

clarify that this was not "accounts receivable financing, where the credit is extended to the

vendor and the receivables are collateral for that extension of credit to the vendor, but rather 'old

line factoring' in which the Factor took the credit risk of the Debtors." Mot. for Summ. J. at 19,

*Dots, LLC v. Milberg Factors, Inc.*, Case No. 14-1818 (Bankr. D.N.J. Sept. 16, 2016) ECF No.

19 ("Factors' Br.").  The Factors further explain that it was they—and not the vendors—who

analyzed Dots' creditworthiness, interacted with Dots' financial personnel, and owned the

related invoice immediately upon its issuance.  Thus, the Factors conclude that it was they—and

not the vendors—who extended credit to Dots, and they rely on an unpublished case from the

United States Bankruptcy Court for the Western District of Virginia in support of their position.

*See In re UE Liquidating Corp.*, Case No. 94-864 (Bankr. W.D. Va. Feb. 24, 1998).

Additionally, both parties draw the Court's attention to the Eighth Circuit Court of

Appeals' decision in *In re LGI Energy Sols., Inc.*, 746 F.3d 350 (8th Cir. 2014).  The Court notes

that none of the opinions relied on by the parties—*Country Junction*, *UE Liquidating*

*Corporation*, and *LGI Energy Solutions*—are binding on this court.  However, because they deal

with factually similar scenarios, the decisions are instructive.  In *Country Junction*, a factoring

entity, Republic Factors, purchased accounts receivable from a vendor, who then shipped goods

to the debtor.  The debtor made payments directly to Republic Factors.  Like the parties in this

case, the financing agreement in *Country Junction* was solely between the factor and the

vendor—wherein the factor purchased the accounts receivable at a percentage of the face amount

16

in exchange for anticipated payments from the debtor on the full face amount.  Also, even though Republic Factors monitored the debtor's financial conditions, as did Factors in this case, there was no contractual relationship between the factor and the debtor—only between the factor and the vendor.  Given these circumstances, the United States Bankruptcy Court for the Western District of Texas first determined that Republic Factors should not be permitted to receive the benefit of the subsequent new value defense based upon goods that it did not advance.  The bankruptcy court then found that the purchase of accounts receivable by Republic Factors did not constitute an extension of credit to the debtor.

In *UE Liquidating Corporation*, the United States Bankruptcy Court for the Western District of Virginia found the facts of its case distinguishable from those of *Country Junction* and reached a different result.  Specifically, the *UE Liquidating Corporation* court determined that the factoring arrangement benefitted the debtor because the goods would not have been shipped but for the factor's transaction with the vendor.  The court impliedly determined that the new value under those set of facts was presented in the form of the goods.  The court then noted that the factor did not provide new value directly to the debtor, but instead provided the new value indirectly to the benefit of the debtor by making the shipment of goods possible.  Ultimately, the court in *UE Liquidating Corporation* held that the new value defense should be available to the factor based on principles of equity and policy considerations.[9]

Finally, in *LGI Energy Solutions*, the debtor performed bill payment services for its clients, large utility customers such as restaurants.  Following the debtor's bankruptcy petition,

---

[9] This Court respectfully disagrees with a portion of the analysis undertaken in *UE Liquidating Corporation*, in which Judge Anderson viewed the transfers as part of a three-party arrangement.  As discussed herein, the Factors in this case—like the factors in *UE Liquidating Corporation*—were assigned all of the vendors' interests in the goods and, thus, the transaction in *UE Liquidating Corporation* and the transfers at issue in this matter are the product of a traditional bilateral transaction—not a three-party relationship—where the creditor supplies goods (new value) directly to the debtor.

an adversary proceeding commenced wherein the trustee attempted to recover preference

payments made by the debtor to an electric company, on behalf of its client.  As a result of the

preferential payment made to the electric company, the debtor's clients continued to receive the

benefit of electricity from the utility company, and, in turn, made subsequent payments to the

debtor.  The utility company argued that those subsequent payments made by the clients to the

debtor should count as new value to offset any preferential liability.  The Court of Appeals for

the Eight Circuit held that "in three-party relationships where the debtor's preferential transfer to

a third party [electric company] benefits the debtor's primary creditor [client], new value (either

contemporaneous or subsequent) can come from the primary creditor, even if the third party is a

creditor in its own right and is the only defendant against whom the debtor has asserted a claim

of preference liability." *LGI Energy Solutions*, 746 F.3d at 356.  The Eight Circuit was careful to

note, however, that its decision was limited to the specific facts of the case before it.

 As an initial matter, the Court notes—as it did during the Hearing—that the case at hand

is factually distinguishable from *LGI Energy Solutions*.  In that case, the party directly providing

the new value, the client-restaurant, was also a creditor.  Here, the parties shipping the goods to

Dots are the vendors, who are no longer involved in the transaction between Dots and the

Factors, as a result of having sold and assigned their interests without recourse.  Moreover, the

debtor's clients in *LGI Energy Solutions* received a benefit from the debtor's preferential

transfers to the utility company in the form of continued electricity; whereas in this case, the

vendor received no additional benefit from Dots' payments to the Factors.

 Furthermore, and most significantly, this Court concludes that the new value extended in

this case was not in the form of new credit, but in the form of goods.  The Factors' argument—

that it supplied new credit—cannot be reconciled with the plain meaning of the statute and its

underlying purpose.  The Court here is faced with a situation where, after a payment to the

Factors was made, the Factors approved orders for additional goods, which were then shipped by

the vendors to Dots.  The Factors ask this Court to view this multi-step transaction as an

extension of credit; and, as a corollary, that extension of credit as new value for purposes of

§ 547(c)(4).  During oral argument, counsel for the Factors explained, "Any time you owe me

money that is on time, on time meaning, it's not right then that you get the money, that's an

extension of credit." Hrg. Tr. 24:21-23.  Indeed, this type of transaction may be viewed as a

"credit" transaction in a larger sense because Dots received goods without first paying for them.

*See* OXFORD ENGLISH DICTIONARY (2d ed.1989) (defining "credit" as "[t]rust or confidence in a

buyer's ability and intention to pay at some future time, exhibited by entrusting him with goods,

etc. without present payment.").  However, this Court is not convinced that this "extension of

credit" is the type of "new credit" contemplated by Congress in the definition of "new value" in

§ 547(a).

The text of the statute supports this Court's decision.  First, the fact that Congress broke

down the definition of "new value" and distinguished between "goods," "services," and "new

credit" suggests an intention to limit the meaning of "credit" to a strictly financial transaction

such as a loan, credit card transaction, or provision of a credit line as opposed to trade credit.

Additionally, Congress' use of the word "or" in the definition of "new value"—"money's worth

in goods, services, *or* new credit"—suggests that these forms of new value are mutually

exclusive. 11 U.S.C. § 547(a)(2) (emphasis added).

Moreover, it is difficult for this Court to conceive of a situation wherein the "new value"

discussed in § 547(c)(4) does not constitute the type of broad credit transaction described by the

Factors.  Because the "new value" in § 547(c)(4) must be unsecured and, if payment was made,

that payment must be otherwise unavoidable, "new value" as it is referenced in § 547(c)(4)

seemingly must always falls within the larger meaning of "credit." *See, e.g.,* 2 BANKRUPTCY

LAW MANUAL § 9A:23 (5th ed.) (observing that most subsequent new value cases involve

delivery of goods on credit under a running account).  In application, however, courts conducting

analyses under § 547(c)(4) have held that goods delivered on credit represent new value in the

form of "goods," not in the form of "new credit." *See, e.g., In re N.Y. City Shoes, Inc.*, 880 F.2d

679, 681 (3d Cir. 1989) (noting that "in the ordinary course of business, suppliers provide goods

to businesses on credit" but that holding that it was "the shipment of shoes . . . [that] constituted

the provision of new value"); *In re Micro Innovations Corp.*, 185 F.3d 329, 333, 335 (5th Cir.

1999) (noting that the parties "engaged in a series of credit transactions" wherein the creditor

shipped goods to debtor prior to receiving payment, but holding that the new value provided was

in the form of "goods"); *see also, e.g., Unsecured Creditors Comm. of Sparrer Sausage Co., Inc.

v. Jason's Foods, Inc.*, 826 F.3d 388, 397 (7th Cir. 2016) (holding that the money's worth of

"meat products" which were never paid for represented the new value for purposes of

§ 547(c)(4)).

Practical concerns further support rejection of the Factors' position.  First, if this Court

were to accept the Factors' argument that their approval of an invoice, which resulted in the

shipment of goods on credit to Dots constituted "new credit," then there exists the potential for

double recovery.  In other words, any creditor who supplied goods to a debtor without first

receiving payment would be able to claim that it provided new value both in the form of "new

credit" and "goods."  This, of course, is nonsensical and could result in a windfall for creditors

which does not further the policy behind the statute.

Additionally, the Factors' construction—that making the shipment of goods on credit possible constitutes "new credit"—further confuses the application of the statute because it may cloud the timing of the transfer for purposes of calculating preference liability.  Generally, courts agree that the relevant date to determine when new value is given—where the new value is in the form of goods—is the date of the shipment of goods. *See, e.g., In re Interstate Bakeries Corp.,* 499 B.R. 376, 389 (Bankr. W.D. Mo. 2013) (noting that, in situations where creditors ordinarily provide goods to purchasers on credit, new orders of goods are shipped upon receipt of a check; therefore, "an enhancement to the bankruptcy estate [occurs at] the time of the shipment (the receipt of the check)") (citing *Matter of Kroh Bros. Dev. Co.*, 930 F.2d 648, 651 (8th Cir. 1991)); *In re Felt Mfg. Co., Inc.*, No. 05-13724, 2009 WL 3348300, at *12 (Bankr. D.N.H. Oct. 16, 2009) (noting that there exists a "general proposition that new value is given on the date of shipment") (citing *In re Eleva, Inc.*, 235 B.R. 486 (B.A.P. 10th Cir. 1999)); 5 COLLIER ON BANKRUPTCY § 547.04[4][c] (Alan N. Resnick & Henry J. Somme eds., 16th ed. 2016) ("Court have held that [where a creditor ships goods to a debtor before receiving the preferential transfer at issue] a creditor extends new value at the time the goods are shipped.").[10]

However, if, as the Factors suggest, the approval of an invoice which results in the shipment of goods is viewed as the "new credit" form of new value, it becomes unclear what date is to be used to calculate preference liability.  An argument may be made that the "new credit" was given the date the invoice was approved and the credit was extended; and that date

---

[10] This Court notes that the conclusion that new value is transferred "on the date the goods are shipped" is more of a generalization than a bright line rule.  As courts have observed, the critical date is the date on which the estate is enhanced by the transfer of new value; in other words, the date on which the debtor takes an interest in the new value. *See, e.g., In re Interstate Bakeries Corp.*, 499 B.R. at 389; *In re Globe Bldg. Materials, Inc.*, 334 B.R. 416, 420 n.4 (Bankr. N.D. Ind. 2005) (noting that the relevant date is the date on which the debtor "acquired a property interest" in the new value).  This precise date may vary depending on the specific terms of the agreement between the parties "as to when [the debtor] acquired an interest in the shipment, or on the 'gap filling' provisions of the UCC if the parties had no specific agreement." *In re Globe*, 344 B.R.at 420 n.4; U.C.C. § 2-503 official comment 5.

may be different from the date the goods were shipped.[11]  Thus, the relevant date to determine

when the new value is given could vary depending on whether a creditor wishes its new value to

be categorized as "new credit" or "goods."  Again, the uncertainty that would be created under

the Factors' interpretation of the statute frustrates its underlying purpose.

"In interpreting the Bankruptcy Code, the Supreme Court has been reluctant to declare its

provisions ambiguous, preferring instead to take a broader, contextual view, and urging courts to

'not be guided by a single sentence or member of a sentence, but look to the provisions of the

whole law, and to its object and policy.'" *In re Price*, 370 F.3d 362, 369 (3d Cir. 2004) (quoting

*Kelly v. Robinson*, 479 U.S. 36, 107 S. Ct. 353, 93 L. Ed. 2d 216 (1986)).  The Factors' position

regarding new value in this case creates ambiguity.  Viewing § 547(c)(4) in the broader,

contextual sense, as this Court must, leads to the conclusion that the new value at issue in this

case must be in the form of shipment of goods, not the extension of credit.

During the Hearing, this Court pressed counsel for the Factors as to the disposition of the

goods in the event Dots rejected a shipment. Hrg. Tr. 28:3-4 ("What happens if Dots returns the

merchandise?").  The inquiry went unresolved at the Hearing; notwithstanding, the Court's

further examination of the Factoring Agreements gives rise to a change in the initial conclusions

reached by the Court.  While Dots placed its order with the vendors, the vendors then

immediately sold and assigned to the Factors all of its rights in the accounts and underlying

merchandise.  In reviewing the Factoring Agreements between the Factors and the vendors, it is

evident that the Factors actually held title to the good that were shipped ultimately to Dots.

---

[11] The exact date that new value is received by a debtor is critical in the application of the affirmative defense—new value can only be applied to preferential transfers made prior to receipt of such new value and subsequent to the transfer.  This analysis can be difficult where there is a sequence of multiple avoidable transfers and subsequent shipments of new merchandise.

The agreement with Finance One states: "Client ['Vendor'] hereby agrees to sell, assign and transfer to FOI [Finance One], and FOI hereby agrees to purchase, all of Client's Accounts, with full power to FOI to collect and otherwise deal with such Accounts as the sole and exclusive owner thereof." Exhibit A at 1, *Dots, LLC v. Milberg Factors, Inc.*, Case No. 14-1818 (Bankr. D.N.J. Sept. 16, 2016) ECF No. 18-3 ("Finance One Factoring Agreement").

"Accounts" in that agreement is defined as:

> All presently existing or outstanding and all hereafter created or acquired accounts (as that term is defined in the UCC), contracts rights, documents, notes, drafts and other forms of obligations owed to or owned by Client arising or resulting from the sale of goods or the rendering of services by Client, all general intangible relating thereto, all proceeds thereof, all guaranties and security therefor, and *all goods and rights represented thereby or arising therefrom, including, but not limited to, returned, reclaimed and repossessed goods and the rights of stoppage in transit, replevin and reclamation.*

*Id.* at 10 (emphasis added).

> Similarly, the agreement between the vendors and Milberg provides, in relevant part,

> The undersigned, hereby sells, assigns, transfers and sets over to you [Milberg] as absolute owner and you hereby agree to purchase from the undersigned, without recourse to the undersigned to the extent expressly set forth below, all Receivables now or hereafter owned by us which are acceptable to you.

> . . .

> The term "Receivables" means and includes all accounts, accounts receivable, notes, bills, acceptances and any and all other forms of obligations owing to use, whether secured or unsecured, all proceed thereof *and all of our rights to any merchandise which is represented thereby (delivered or undelivered), including all of our rights of stoppage in transit, replevin and reclamation as an unpaid vendor or lienor. You shall be privileged to enjoy all of the rights and remedies of the seller of such goods* and shall be and become subrogated to all guaranties, collateral and other rights possessed by us or due to come into our hands, but you shall not be liable in any manner for exercising or refusing to exercise any rights thereby bestowed.

Exhibit B at 1, *Dots, LLC v. Milberg Factors, Inc.*, Case No. 14-1818 (Bankr. D.N.J. Sept. 16, 2016) ECF No. 18-4 ("Milberg Factoring Agreement").  (emphasis added).[12]  Returning to the Court's original inquiry at the Hearing, rejected goods are held by the vendors *in trust* for the Factors' benefit.

An examination of the invoices in this case further evidences the fact that the Factors owned not only the accounts receivable, but also the goods. *See* Exhibit A – Invoices at 1, *Dots, LLC v. Finance One*, Case No. 14-1826 (Bankr. D.N.J.  Jan. 27, 2016) ECF No. 33-2 ("This account *and the merchandise it represents* has been assigned to and is payable only to Finance One, Inc.") (emphasis added).  Because this Court determines that the new value at issue in this case were the goods shipped to Dots, and because the Factors were the owner of those goods, it follows that the Factors provided the new value to Dots.  Accordingly, they may assert an affirmative defense under § 547(c)(4).  Dots is not entitled to summary judgment on this issue.

### b.  Must new value remain unpaid in order for the § 547(c)(4) defense to apply?

Dots next submits that, to the extent new value exists in this case, the Factors are not entitled to the affirmative defense because, in the Third Circuit, subsequent advances must remain unpaid in order for the defense to apply; and, here, the Factors received several payments at the end of the preference period.  The Factors contend that new value is not limited to only unpaid invoices, but also includes new value transfers for which avoidable payments have been made.  As discussed during the Hearing, this Court agrees with the Factors and concludes that the new value defense under § 547(c)(4) is not limited to unpaid invoices, and extends to all

---

[12] The Court notes on aside that ownership of the goods being shipped may, in fact, give rise to unanticipated risks; for example, product liability issues.

transfers of new value including such transfers for which Dots made payments that are avoidable.

In reaching this conclusion, the Court is guided by the plain[13] language of the statute.  In relevant part, the statute provides that the affirmative defense applies to transfers that gave the debtor new value "on account of which new value the debtor did not make an otherwise unavoidable transfer to or for the benefit of such creditor." § 547(c)(4)(B).  Thus, the language of the statute does not limit the inquiry to simply whether or not the creditor was paid; but instead focuses on whether, if payment was received, that payment—or transfer on account of the new value—was otherwise unavoidable. *See* 4 NORTON BANKR. L. & PRAC. 3d § 66:36 ("The focus of the inquiry is on the avoidability of the debtor's subsequent payments, and not on whether the new value remains unpaid."); *see also In re Phoenix Rest. Grp., Inc.*, 317 B.R. at 499 ("Had Congress intended 'otherwise unavoidable' to mean that new value must remain unpaid, it would simply have said so.").

Moreover, although cases decided closer to the enactment of the Code referred to a simple "paid" versus "unpaid" analysis for purposes of § 547(c)(4), there is a recent trend toward an interpretation in which "the new value defense is available, despite payment, if the payment was an avoidable transfer." *In re PMC Mktg. Corp.*, 518 B.R. 150, 159 (B.A.P. 1st Cir. 2014) (collecting cases); *see also In re Pillowtex Corp.*, 416 B.R. 123 (Bankr. D. Del. 2009) (holding that "it is not a prerequisite to creditor's successfully asserting 'subsequent new value' defense to preference claim that this new value must remain unpaid, as long as new value has not been repaid with an otherwise unavoidable transfer."); 5 COLLIER ON BANKRUPTCY § 547.04[4][e] (Alan N. Resnick & Henry J. Somme eds., 16th ed. 2016) ("With increasing consistency, more

---

[13] The language is "plain" to the extent one can employ such term in reference to the abhorrent syntax used in this provision.

25

modern decisions have rejected the notion that the new value must remain 'unpaid,' as representing an oversimplification of the proper application of section 547(c)(4).").

The Court notes that Dots relies on the opinion in *In re N.Y. City Shoes, Inc.*, 880 F.2d 679 (3d Cir. 1989) in support of its position.  The issue before the Third Circuit in that case was whether "the bankruptcy court erred in finding that the creditor has established that it treated the transaction as a cash transfer on the day it received the post-dated check." *Id.* at 680.  Indeed, the Third Circuit in *N.Y. City Shoes* stated that, if a creditor satisfies all three elements of § 547(c)(4), "it is entitled to set off the amount of the 'new value' which remains *unpaid* on the date of the petition against the amount which the creditor is required to return to the trustee on account of the preferential transfer it received." *Id.* at 680 (emphasis added).  It is this "unpaid" language which is the basis for Dots' assertion that, in the Third Circuit, new value must remain unpaid in order for the affirmative defense to apply.

However, the Third Circuit later clarified that the new value defense test outlined in *N.Y. City Shoes* was dicta, and was not binding upon future courts. *See In re Friedman's Inc.*, 738 F.3d at 552.  Specifically, the *Friedman's* court addressed the extra-statutory language included in the *N.Y. City Shoes* opinion regarding the third § 547(c)(4) requirement; namely that "the debtor must not have fully compensated the creditor for the 'new value' *as of the date that it filed its bankruptcy petition*." *N.Y. City Shoes*, 880 F.2d at 680 (emphasis added).  The *Friedman's* court noted that its reference in *N.Y. City Shoes* to the petition date was not germane to its analysis in that case and, thus, was dicta. *In re Friedman's Inc.*, 738 F.3d at 552 ("If a determination by our Court is not necessary to our ultimate holding, 'it properly is classified as *dictum.*'") (quoting *Calhoun v. Yamaha Motor Corp., U.S.A.,* 216 F.3d 338, 343 n.9 (3d Cir. 2000)).  Because, as set forth above, the issue in *N.Y. City Shoes* involved the proper date of the

26

transfer, and did not depend on whether the new value was paid or unpaid, the Third Circuit's reference in *N.Y. City Shoes* to "'new value' which remains unpaid" was likewise not germane to its analysis in that case. *N.Y. City Shoes*, 880 F.2d at 680.  Accordingly, it, too, is dicta, and is not binding on this Court. *See In re Proliance Int'l, Inc.*, 514 B.R. 426, 432 (Bankr. D. Del. 2014) ("To date, the Third Circuit has not issued an opinion germane to the 'remains unpaid' portion of its statement in *New York Shoes*. As such, the Third Circuit has not (yet) weighed in on the remains unpaid/subsequent advance dispute.").  For this reason, this Court rejects Dots' argument that, in the Third Circuit, new value must remain unpaid.[14]

### c.   Is the new value secured by an otherwise unavoidable security interest?

Dots also contends that it is entitled to summary judgment because—to the extent the Factors supplied new value—such new value is secured by a security interest, which renders the new value affirmative defense inapplicable. *See* 11 U.S.C. § 547(c)(4)(A) (requiring that the new value provided must "not [be] secured by an otherwise unavoidable security interest").  Dots asserts that the Factors hold a security interest as evidenced by "the express terms of their own Factoring Agreements [which] granted Defendants a security interest in accounts payable by the Debtors to their vendors." Dots' Opp'n at 20.  To the contrary, the Factors contend that they did not hold a security interest in the new value provided to Dots.  Specifically, the Factors assert that the extension of credit was not subject to a security interest, and that they did not obtain any security interest on any property owned by Dots.  The Factors have the better argument.

---

[14] The Court notes that Dots cites a series of cases in which bankruptcy courts observe that, based on the specific facts of a particular case, a certain portion of the new value at issue was unpaid and the §547(c)(4) defense applies. *See, e.g., In re AES Thames, LLC*, 547 B.R. 99, 102 (Bankr. D. Del. 2016); *In re Opus E., LLC*, 528 B.R. 30, 95 (Bankr. D. Del. 2015); *In re Waccamaw's Homeplace*, 325 B.R. 524, 535 (Bankr. D. Del. 2005).  Nevertheless, these cases do not stand for the proposition that new value *must* remain unpaid for the defense to apply.  Instead, the courts in the cases were merely utilizing the test for the application of the new value affirmative defense under § 547(c)(4) under the facts presented, and were not imposing any additional, extra-statutory requirements.

As an initial matter, the Bankruptcy Code defines "security interest" as a "lien created by an agreement." 11 U.S.C. § 101(51).  However, in this case no such agreement exists between Dots and the Factors.  Moreover, any security interest would only be enforceable against Dots if Dots had authenticated a security agreement. U.C.C. § 9-203(b)(3)(B).[15]  Here, no evidence has been presented which establishes that Dots authenticated any such security agreement. Accordingly, Dots has not set forth any basis for finding a security interest in favor of the Factor, and they are not entitled to summary judgment on this matter.  The Factors are not precluded from asserting the new value affirmative defense based on § 547(c)(4)(A).

   **d.  Under the circumstances of this case, should such new value be calculated on a de-coupled or coupled basis**?

With respect to the calculation of the Factor's net preference liability, Dots posits that the new value analysis in a three-party relationship must be conducted on an individual vendor basis. In other words, Dots contends that "a factor may not use new value provided by Vendor A to offset a payment made on account of goods provided by Vendor B." Dots' Mot. for Summ. J. at 25.  Thus, Dots asserts that new value must be calculated on a "de-coupled" basis.  Dots cites again to the Eighth Circuit's opinion in *LGI Energy Solutions*, in support of this position. *See* 746 F.3d 356-57 (holding that preferential transfers made on behalf of one client-creditor cannot be used to calculate preference liability of another client-creditor).

---

[15] With respect to attachment and enforceability of a security interest, the Uniform Commercial Code provides, in relevant part,

> a security is enforceable against the debtor and third parties with respect to the collateral only if:
> (1) value has been given;
> (2) the debtor has rights in the collateral or the power to transfer rights in the collateral to a secured party; and
> (3) one of the following conditions is met:
>> (A) the debtor has authenticated a security agreement that provides a description of the collateral and, if the security interest covers timber to be cut, a description of the land concerned; . . .

U.C.C. § 9-203(b).

The Factors, on the other hand, contend that the case presently before the Court is factually distinguishable from *LGI Energy Solutions*.  Further, the Factors frame the issue in a simpler way and explain that they provided new value directly to Dots (in the form of new credit), and that Dots then made payment directly to the Factors on invoices which the Factors owned.  Accordingly, the Factors assert that there is no basis to calculate preference liability on an individual-vendor, or de-coupled, basis.

During the Hearing, the Court expressed a concern that the factual record before it was insufficient to make a decision as to the issue of coupling or de-coupling.  However, as explained above, a post-Hearing re-examination of the facts of this case and the impact on the legal concepts at issue have pointed the Court towards a different conclusion.  Specifically, the Court concludes that the Factors did provide new value to Dots; albeit not in the form of "new credit," as the Factors suggest.  Instead, the Court holds, for the reasons previously discussed, that the new value provided in this case was in the form of goods, and that the Factors supplied this new value to Dots because it owned the goods themselves, and not just the accounts.

Applying this same rationale to the coupling/de-coupling issue, this Court is compelled to agree with the Factors, and determines that the Factors' preference liability may be calculated on a coupled (aggregate) basis.  Because this Court finds that the new value—the goods—was provided directly to Dots by the Factors, there is no reason to conduct an analysis on and individual-vendor basis.  In other words, it does not matter that the new value shipped to Dots by Vendor A is used to offset payments on account of goods shipped by Vendor B because, in the Court's view, after the invoices were factored, the vendor-entities who shipped the goods were no longer part of the equation; the Factors were the owners of the accounts *and* all the goods.  Although the goods may have been shipped by multiple vendors, and although the Factors may

have purchased the goods and invoices from multiple vendors, the fact remains that the

Factors—not the individual vendors—owned the goods that enhanced the bankruptcy estate and

also received the preference payments at issue.  Accordingly, there is no reason to look to the

individual vendors when calculating the Factors' preference liability.

**V.   Conclusion**

     For the reasons expressed, Plaintiff's Motion is denied.  Counsel for Defendants is

directed to submit a form of order.  A case management conference will be held telephonically

on January 26, 2017 at 11:00 a.m.

Dated:  January 10, 2017